**FILED**

**JANUARY 18, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**08 C 433**

| | |
|---|---|
| AAR PARTS TRADING, INC., | |
| Plaintiff, | |
| v. | No. |
| LINEAS AEREAS AZTECA S.A. de C.V., | |
| Defendant. | |

**JUDGE GUZMAN**
**MAGISTRATE JUDGE BROWN**

## COMPLAINT

Plaintiff, AAR Parts Trading, Inc. ("AAR"), complaining of defendant, Lineas Aereas Azteca S.A. de C.V. ("Azteca"), alleges as follows:

### PARTIES

1.      Plaintiff AAR is an Illinois corporation with its principal place of business at 1100 N. Wood Dale Road, Wood Dale, Illinois. At all relevant times, AAR was engaged in, among other things, the business of aircraft engine sales and leasing, including the leasing of aircraft engines.

2.      Azteca is an entity organized under the laws of Mexico, and maintains its principal offices in Guadalajara, Mexico.  At all relevant times, Azteca was engaged in the business of air transportation.

### JURISDICTION AND VENUE

3.      This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a), as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest

and costs, and is between a citizen of a state (Illinois) and a citizen or subject of a foreign state (Mexico).

4.    Venue is proper in this district under 28 U.S.C. § 1391 because (i) a substantial part of the events or omissions giving rise to the claims herein occurred in this district, (ii) the agreement between the parties that forms the basis for AAR's claims against Azteca contains a forum selection cause permitting suit in this district, and (iii) Azteca is an "alien" within the meaning of 28 U.S.C. § 1391(d) and therefore may be sued in this district.

## BREACH OF CONTRACT – COUNT I

**A.    The General Lease and the Aircraft Engine Lease Agreement**

5.    On or about October 10, 2006, AAR and Azteca entered into a written contract, styled "General Terms Engine Lease Agreement between AAR Parts Trading, Inc. and Lineas Aereas Azteca S.A. de C.V., Contract Number 28026" (hereinafter the "General Lease"). A copy of the General Lease is attached hereto as Exhibit A.

6.    Azteca agreed to lease from AAR aircraft engines under the terms and conditions of the General Lease (Exh. A). For each aircraft engine Azteca leased from AAR under the General Lease, Azteca and AAR also entered into an "Aircraft Engine Lease Agreement." The Aircraft Engine Lease Agreement entered into between AAR and Azteca expressly incorporates by reference the terms of the General Lease.

7.    By their terms, the General Lease and the Aircraft Engine Lease Agreement are governed by Illinois law (Exh. A, § 24).

8.    In addition, under the General Lease and the Aircraft Engine Lease Agreement, AAR and Azteca (i) agreed that "any state or federal court located in the State of Illinois shall have jurisdiction to hear any suit, action, or proceeding arising out of or in connection with" the General Lease or an Aircraft Engine Lease Agreement, and (ii) "acknowledge[d] and irrevocably

consent[ed] and submit[ted] to the jurisdiction of any such court in any such suit, action or proceeding." (Exh. A, § 25).

**B.    Azteca's Lease of Engine 858374**

9.    On or about October 19, 2006, Azteca leased from AAR an aircraft engine ("Engine 858374") under the General Lease.

10.    Pursuant to the General Lease, Azteca and AAR also entered into an "Aircraft Engine Lease Agreement, Contract Number 28027" for the lease of Engine 858374 (hereinafter "the Engine 858374 Lease"). A copy of the Engine 858374 Lease, including all amendments thereto, is attached as Exhibit B.

11.    The Engine 858374 Lease expressly incorporates by reference the terms and conditions of the General Lease. (Exh. B, the 85374 Lease, Article I).

12.    Under the General Lease and the Engine 858374 Lease, Azteca was required to, among other things:

    (i)    procure and maintain certain "Comprehensive Airline Liability Insurance," "Aircraft Hull Insurance," "Aircraft Hull War Risk, Hijack and Confiscation Insurance," and "All Risk Spares Insurance." (Exh. A, General Lease, Section 14(a));

    (ii)    pay "Daily Rent" in the amount of $1,600 per day and a "Use Fee" in the amount of $135 per hour and $45 per cycle. (Exh. B, the 85374 Lease, exhibit AA thereto);

    (iii)    pay interest on overdue "Daily Rent" and "Use Fees" at the rate of prime plus 5%. (Exh. A, General Lease, Section 4(e));

    (iv)    return the Engine 85374, and related equipment, to AAR's facility in Wood Dale, Illinois, upon termination of the lease. (Exh. A, General Lease, Section 18(b)).

13.    AAR has duly performed all of its obligations under the General Lease and the Engine 858374 Lease.

**C.     Azteca Ceases Operating**

14.     On or about March 26, 2007, the Secretariat of Communications and Transportation of Mexico suspended Azteca's operations as a result of financial, personnel training and aircraft maintenance issues.

15.     According to the Dirección General de Aeronántica Civil of the Secretariat of Communications and Transport, Azteca ceased operations on October 10, 2007.

**D.     Azteca's Failure to Maintain Insurance in Breach of the General Lease and the Engine 858374 Lease**

16.     On or before June 11, 2007, Azteca breached its obligation under Section 14 of the General Lease to maintain insurance coverage for Engine 858374.

17.     Azteca's failure to maintain insurance constituted an "Event of Default" under Section 19(a)(ii) of the General Lease, authorizing AAR to terminate the General Lease and the Engine 858374 Lease upon written notice.

18.     On June 11, 2007, AAR provided Azteca with written notice of termination of the General Lease and the Engine 858374 Lease, as a result of Azteca's failure to maintain insurance pursuant to Section 14 of the General Lease.  A copy of AAR's written notice of termination, dated June 11, 2007, is attached hereto as Exhibit C.

**E.     Azteca's Failure to Make Payments in Breach of Its Contractual Obligations**

19.     Pursuant to the Engine 858374 Lease, AAR delivered monthly invoices to Azteca.

20.     In breach of the Engine 858374 Lease, Azteca has failed to make payments with respect to the following invoices, including interest:

| Invoice Number | Due Date | Lease ESN 858374 | Interest Accruing Through 12/19/07 |
|---|---|---|---|
| 20501099 | 2/1/2007 | 44,800.00 | 5,145.25 |
| 20503574 | 2/10/2007 | 58,543.20 | 6,532.38 |
| 20502338 | 3/1/2007 | 49,600.00 | 5,192.37 |
| 20502323 | 3/10/2007 | 54,779.40 | 5,555.61 |
| 20503037 | 4/1/2007 | 48,000.00 | 4,484.71 |
| 20504680 | 5/1/2007 | 49,600.00 | 4,094.04 |
| 20505703 | 6/1/2007 | 48,000.00 | 3,421.81 |
| 20506850 | 7/1/2007 | 49,600.00 | 2,995.70 |
| 20508086 | 8/1/2007 | 49,600.00 | 2,437.53 |
| 20509440 | 9/1/2007 | 48,000.00 | 1,818.74 |
| L1012007 | 10/1/2007 | 49,600.00 | 1,348.71 |
| L1112007 | 11/1/2007 | 48,000.00 | 786.08 |
| L1212007 | 12/1/2007 | 30,400.00 | 185.52 |
| TOTALS | | 628,522.60 | 43,998.46 |

21.    Azteca's failure to make full payment of the invoices identified above constituted "Events of Default" within the meaning of Section 19 of the General Lease (Exh. A, § 19).

22.    Azteca's breach is ongoing.  Although it wrongfully retains possession of Engine 858374, Azteca continues to refuse to make monthly payments, as such payments become due.

**F.    Azteca's Continuing Refusal to Return Engine 858374 to AAR**

23.    Under the General Lease, title to Engine 858374 remained fully vested in AAR. (Exh. A, § 15).

24.    In its written notice of termination, dated June 11, 2007, AAR demanded that Azteca "immediately ship [Engine 858374] to AAR's facility in Wood Dale, Illinois" pursuant to Section 18(b) of the General Lease.   (Exh. C, 6/11/07 letter).

25.    On October 11, 2007, AAR again demanded that Azteca return to AAR Engine 858374, pursuant to Section 18(b) of the General Lease.  A copy AAR's October 11, 2007 letter is attached hereto as Exhibit D.

26.     In addition, in its October 11, 2007 letter to Azteca, AAR stated as follows

> "AAR hereby demands that Azteca immediately relinquish custody of [Engine 858374] to AAR or AAR's designated agent. Please confirm that Azteca will cooperate with AAR and will permit AAR or AAR's designated agent to immediately remove [Engine 858374] from Azteca's hangar."

(Exh. D, 10/11/07 letter).

27.     Notwithstanding AAR's demands, Azteca has refused and continues to refuse to return Engine 858374 to AAR, and to otherwise relinquish custody of Engine 858374 so that AAR can take possession of Engine 858374 at Azteca's hangar.

28.     As a result of Azteca's breach of its obligations under the General Lease and under the Engine 858374 Lease, AAR has sustained substantial economic damages.

29.     In addition, AAR has been wrongfully deprived, and continues to be wrongfully deprived, of the possession of Engine 858374.

WHEREFORE, plaintiff, AAR Parts Trading, Inc., prays that this Court:

    (a)     award compensatory damages in its favor and against defendant, Azteca Airlines, S.p.A., in an amount to be determined at trial, plus interest;

    (b)     order specific performance of defendant's obligation under the General Lease and the Engine 858374 Lease to deliver to plaintiff Engine 858374, including all records and related items;

    (c)     award attorneys' fees in its favor pursuant to Section 28 of the General Lease; and

    (d)     grant such further or alternative relief as this Court deems appropriate under the circumstances.

### JURY TRIAL

Plaintiff demands a jury trial.  Dated:  January 18, 2008

/s/ John M. Murphy
One of the Attorneys for Plaintiff,
AAR PARTS TRADING, INC.

John M. Murphy (No. 6199316)
Peter P. Tomczak (No. 6278608)
BAKER & McKENZIE LLP
One Prudential Plaza
130 East Randolph Drive
Chicago, Illinois   60601
(312) 861-8000

CHIDMS1/2590254.1

# EXHIBIT  A

DE : AZTECA          NO. DE FAX : 5642          19 OCT. 2006 02:57PM P1

# GENERAL TERMS ENGINE LEASE AGREEMENT

## BETWEEN

## AAR PARTS TRADING, INC.

## AND

## LINEAS AEREAS AZTECA S.A. DE C.V.

### CONTRACT NUMBER 28026

This General Terms Engine Lease Agreement ("GTA") is made and entered into as of this 10th day of October, 2006, by and between AAR Parts Trading, Inc. ("Lessor") with offices at One AAR Place, 1100 N. Wood Dale Road, Wood Dale, Illinois 60191 and Lineas Aereas Azteca S.A. de C.V. ("Lessee") with offices at Aviacion General Zona Hangares, "C" No. 27, Mexico D.F. 15620, Mexico.

In consideration of the premises and mutual promises herein contained, Lessor and Lessee hereby agree as follows:

1.  **TERM OF THIS GTA**

    The term of this GTA will commence on the date of the GTA and will continue thereafter for three (3) years.

2.  **INDIVIDUAL ENGINE LEASES; TERM**

    a.  Lessor will lease aircraft engines to Lessee from time to time to the extent such engines are desired by Lessee and are available from Lessor, all upon the terms and conditions hereof. Such individual engine leases will be initiated by Lessee submitting to Lessor an executed Aircraft Engine Lease Agreement ("Lease") in the form of Exhibit A. Each Lease will be for a single engine described by serial number in the Lease and all parts and attachments thereto (the "Engine"), all Engine records in the possession of Lessor which are requested by Lessee, Engine records generated by Lessee during the Lease Term, and one Engine stand described by serial number in the Lease, collectively referred to as the "Equipment."

    b.  The term of each Lease will be for the period specified in such Lease ("Lease Term"). Any Lease which, by its own terms, extends beyond the term of the GTA, will continue in effect in accordance with the terms and conditions of the GTA until said Lease expires. Notwithstanding the expiration of a Lease Term, all of the obligations of Lessee under the Lease shall continue until such time as the Equipment is returned to Lessor in accordance with the terms of the Lease.

    c.  Lessee will forthwith redeliver the Equipment to Lessor upon the expiration or earlier termination of the Lease pertaining to such Equipment.



OCT-19-2006 JUE 03:57PM ID:          PAG. :1

DE :                         NO. DE FAX :                    13 AGO. 2000 01:11PM P1

3.      DELIVERY, INSPECTION, ACCEPTANCE AND INSTALLATION

a.      Lessor will deliver the Equipment to Lessee on the Delivery Date at the Delivery Location specified in the applicable Lease (the "Delivery"). At time of Delivery, the Engine will have a Federal Aviation Administration ("FAA") approved return to service maintenance release tag affixed to it. Lessor will also provide to Lessee all records required for operation of the Engine, including, if available, an "Engine Condition Checklist" which will detail the last Engine inspection at a repair facility. At Delivery, risk of loss, damage to or destruction of the Equipment shall transfer from Lessor to Lessee and, except as otherwise provided herein, such risk shall remain with Lessee until the Equipment has been redelivered by Lessee to Lessor in accordance with the terms of this GTA.

b.      Lessee will deliver to Lessor a receipt for the Engine substantially in the form of Exhibit B, duly executed by an authorized representative of Lessee upon delivery of such Engine.

c.      Delivery by Lessor is subject to the following conditions precedent:

        i.      Receipt by Lessor of the Initial Payment required by Section 4.b. below; and

        ii.     Receipt by Lessor of the insurance certificates required by Section 14 below.

d.      Lessee may conduct a visual (including borescope) inspection of the Engine within the Inspection Period stated in the Lease to determine whether the Engine is acceptable to Lessee. If Lessee installs or operates the Engine or does not notify Lessor before the end of such period that the Engine is not acceptable to Lessee, it will be conclusively deemed that Lessee has accepted the Engine. Any Engine rejection shall be by notice to Lessor detailing the reason for rejection. In the event of such rejection, Lessee will hold the Equipment pending shipping instructions from Lessor, at which time Lessee will ship the Equipment to Lessor's designated location at Lessor's sole expense. Upon receipt of the Equipment by Lessor, following a rejection by Lessee, the Lease with respect to such Equipment will terminate, all funds previously received by Lessor from Lessee pursuant to such Lease will be returned to Lessee, and neither party will have any further liability to the other under such Lease.

e.      Within forty eight (48) hours after installation of an Engine on an aircraft, Lessee will notify Lessor of the type and serial number of such aircraft.

f.      Lessee represents and warrants to Lessor that each lessor, lender, or any other party having an interest in any aircraft upon which an Engine is or may be installed under any lease has authorized such installation and has acknowledged to Lessee that such lessor, lender, or other party will acquire no right, title, or interest in and to such Engine by reason of such installation.

4.      CHARGES AND PAYMENT

a.      Lessee will pay to Lessor:

        i.      the one-time Transaction Fee specified in each Lease; and

        ii.     the Daily Rent specified in each Lease for each day or fraction thereof during the term of each such Lease, commencing with the Delivery Date specified in the Lease and continuing until the return of the Equipment in accordance with the terms of this GTA and the Lease; and

        iii.    the Use Fee specified in each Lease for either (a) each hour of Engine operation or fraction thereof, or each cycle of operation (or cycle of accumulation in the case of JT8D-200 series engines), whichever is greater, or (b) each hour of Engine operation or fraction thereof and each cycle of operation (or cycle of accumulation in the case of JT8D-200 series engines); and

        iv.     the Security Deposit specified in each Lease.

2

KN

DE : AZTECA                    NO. DE FAX : 5642              19 OCT. 2006 03:05PM P1

(a)     The Security Deposit shall be held by Lessor as security for the due and punctual payment by Lessee of all amounts payable by it, and the due and punctual performance by Lessee of all of its obligations, hereunder and under any other agreement between Lessor and Lessee. The Security Deposit is not to be used by Lessee in lieu of any payment obligations under the Lease. Lessee hereby assigns, transfers and pledges to Lessor, and hereby grants to Lessor, a first-priority security interest in, the Security Deposit to secure such payment and performance. No interest shall be paid on the Security Deposit. If an Event of Default (as hereinafter defined) shall occur and be continuing, then in addition to any other rights Lessor may have under applicable law as a secured party or otherwise, or under this GTA or any other agreement, Lessor may set off against, use, apply or retain all or any portion of the Security Deposit in full or partial payment for amounts payable by Lessee under this GTA or any other agreement or for amounts necessary to compensate Lessor for its expenses arising in connection with such Event of Default. In such event, Lessee shall replenish the Security Deposit immediately upon written notice from Lessor.

(b)     So long as no Event of Default shall have occurred and be continuing, that portion, if any, of the Security Deposit that has not previously been used or applied, or set off against, as provided for in this GTA, shall be returned to Lessee by wire transfer of immediately available United States Dollars to an account of Lessee, specified in writing by Lessee to Lessor, (a) on the date which is no later than 10 Business Days after and excluding the date upon which the Engine is returned to Lessor in accordance with this GTA, or (b) if an Event of Loss (as hereinafter defined) shall have occurred, no later than the third Business Day following the date upon which Lessor has been paid all amounts required to be paid under, and as provided in, this GTA.

b.     Prior to Delivery of the Equipment, Lessee will pay Lessor an Initial payment ("Initial Payment") consisting of the Transaction Fee and the Security Deposit and the Daily Rent for the entire Lease Term or the first thirty (30) day period of the Lease, whichever is less. If the term of a Lease exceeds thirty (30) days, Lessee shall pay Daily Rent to Lessor monthly in advance for either the remainder of the term of such Lease or the succeeding thirty (30) day period, whichever is less. Lessee shall pay Use Fees to Lessor within ten (10) days after each calendar month of the Lease based on actual Engine operation during such preceding calendar month. Notwithstanding the preceding sentence, Lessee shall pay Use Fees to Lessor, for the month in which redelivery occurs, within ten (10) days after redelivery of the Engine to Lessor.

c.     All payments will be made by bank transfer of immediately available funds in U.S. Dollars to the account of Lessor at:

Bank Name:          LaSalle Bank N.A.
Address:            135 S. LaSalle Street, Chicago, Illinois 60603 USA
Account Name:       AAR Corp Concentration Account
Account Number:     5800415597
ABA:                071000505
Swift Code (int'l): LASLUS44

d.     Within ten (10) days after a request by either party, but not more frequently than once every thirty (30) days during any Lease, and within thirty (30) days after redelivery of the Equipment to Lessor, the parties will reconcile all charges under such Lease. Lessee will then promptly pay Lessor any payment deficiency and, provided Lessee is not in default hereunder, Lessor will then pay Lessee any payment excess.

e.     Lessee shall pay to Lessor, upon demand, to the extent permitted by applicable law, interest on any installment of Rent (Daily Rent, Use Fees or other) not paid when due under any Lease hereunder, for any period for which any of the same is overdue (without regard to any grace period) at a rate equal to Prime plus five percent (5%).

*KN*

3

5.   COMPLIANCE WITH LAWS; LESSEE'S REPRESENTATIONS AND WARRANTIES

Lessee hereby represents and warrants that:

a.   The Equipment will be used and operated solely in compliance with all statutes, laws, ordinances, rules and regulations of any Federal, state or local governmental body, agency, or authority of the United States or any foreign governmental body, agency, or authority applicable to the use and operation of the Equipment;

b.   Lessee shall procure and maintain in effect all licenses, registrations, certificates, permits, approvals and consents required by any laws or by any governmental body, agency or authority in connection with the ownership, delivery, installation, use and operation of the Equipment;

c.   The Equipment will at all times be and remain in the possession and control of Lessee except as specifically provided in Section 17;

d.   The leasing of the Equipment from Lessor by Lessee, the execution and delivery of each Lease and the compliance by the Lessee with the terms thereof, and the payments and performance by Lessee of all of its obligations thereunder will not violate or constitute a breach of any provision of law, any order of any court or other agency of government, or any indenture, agreement or other instrument to which Lessee is a party;

e.   Neither the execution and delivery of any Lease by Lessee, nor the payment and performance by Lessee of all of its obligations hereunder and thereunder, requires the consent or approval of, the giving of notice to, or the registration, filing or recording with, or the taking of any other action in respect of, any Federal, state, local or foreign government or governmental authority or agency or any other person; and

f.   No action, including any filing or recording of any document, is necessary or advisable in order to establish and perfect Lessor's or any assignee's title to and interest in the Equipment as against any third parties in any applicable jurisdiction.

6.   USE AND MAINTENANCE

a.   Lessee will use each Engine only on commercial transport aircraft owned or operated by Lessee (or by an approved sublessee) in a safe manner, and in accordance with the manufacturer's recommended operating procedures and manuals and instructions in effect from time to time and only in those countries for which the insurance required under Section 14 herein is effective.

b.   During a Lease Term, Lessee will repair and maintain the Engine in accordance with applicable requirements of all governmental agencies, the requirements and recommendations of the manufacturers of the Engine, and any special instructions of the Lessor, provided that any such special instructions will not cause Lessee to bear any additional expense for any Engine leased hereunder.

Lessee shall be responsible for line maintenance repairs; on-wing repairs; and any repairs and/or maintenance required to return an Engine to serviceable condition when the unserviceable condition resulted from an Abnormal Failure (where "Abnormal Failure" is defined as any unserviceable Engine condition that results in whole or part from foreign object damage or abuse, misuse or negligent management of the Engine during the Lease). Daily Rent obligations shall continue unabated during such time as the Engine is being repaired by Lessee due to an Abnormal Failure. Lessee shall not be responsible for repairs to return an Engine to serviceable condition when the unserviceable condition resulted from Normal Wear and Tear (where "Normal Wear and Tear" is defined as any unserviceable Engine condition that is not due to an Abnormal Failure). Lessee will advise Lessor and obtain Lessor's approval before commencing any repairs to the Engine for which Lessor is responsible.

If, during a Lease Term, an Engine becomes unserviceable due to Normal Wear and Tear, (i) Lessee shall immediately notify Lessor of the unserviceable condition, and (ii) unless otherwise



4

agreed by Lessor and Lessee, Lessee shall promptly return the Engine to Lessor in accordance with Section 18 and other provisions herein.

c.  Any replacement parts furnished by Lessee (in consideration of Lessee's above-stated Engine repair obligations) will be free and clear of liens and of equal or better value and modification status than the part replaced, assuming the part replaced was in the condition required by this GTA. All such replacement parts must have been last serviced by an FAA-approved repair facility, and such parts will become the property of Lessor immediately upon installation on an Engine. All replaced parts will become the property of Lessee immediately upon replacement.

d.  If any government rule, order, regulation or authority requires that a modification or repair be made to an Engine during its Lease Term ("Mandatory Change"):

   i.   Lessee will not be obligated to perform such Mandatory Change;

   ii.  Lessee will be permitted to return the Engine to Lessor prior to the expiration of the Lease Term but no earlier than the due date for such Mandatory Change; and

   iii. The Engine shall be returned to Lessor in accordance with Section 18 and other provisions herein; except that the Engine need not have a serviceable tag affixed if the Engine is unserviceable solely as a result of the Mandatory Change not yet having been performed or due to Normal Wear and Tear.

7.  **RECORDS**

a.  Lessee will maintain complete and accurate records in English for all Equipment and will provide them to Lessor on request. All such records will be deemed Equipment at the time generated. Within two (2) business days after each calendar month of the Lease, Lessee will report to Lessor the hours and cycles of operation and the registration number of the aircraft on which the Equipment is installed. Upon redelivery of the Engine to Lessor, Lessee will report to Lessor the usage during the then-current calendar month, as well as the total hours and cycles operated during the Lease Term.

b.  Upon redelivery of the Equipment to Lessor, Lessee will return all Engine records delivered to Lessee by Lessor, together with all Engine records generated by Lessee.

c.  With respect to any part installed by the Lessee during a Lease and not removed prior to the return of an Engine, the records returned to Lessor will include:

   i.   Part number, description, and serial number (if part is serialized); and

   ii.  Historical records, including but not limited to (a) serviceability status of the part at installation; (b) for a time-controlled part, total time and cycles, time and cycles since overhaul as may be applicable, and total time and cycles of the Engine at the time of part installation; and (c) for a life-limited part, documentation tracing usage of the part since new.

8.  **MODIFICATIONS**

Lessee will not make any modifications or alterations to any Equipment without Lessor's prior written consent. In the event modifications or alterations to the Equipment are made with the Lessor's prior written consent, Lessee shall nonetheless return the Equipment to its originally delivered condition prior to redelivery of the Equipment to Lessor at expiration or termination of the Lease, unless Lessor expressly agrees to the contrary in writing.

9.  **TOTAL LOSS**

In the event of actual or constructive total loss or destruction of any Engine or damage thereto beyond economic repair during the term of a Lease, or the loss of possession of any Engine for more than thirty (30) days by reason of seizure, requisition, theft, disappearance, or otherwise, Lessee will immediately notify

5

Lessor thereof. In the event of such loss, damage (provided that Lessee is responsible for such damage in accordance with Section 6.b. herein), or loss of possession, or if Lessee fails to redeliver the Equipment in accordance with the terms hereof (each referred to as an "Event of Loss"), Lessee will pay Lessor upon demand the Agreed Value of such Engine as specified in the Lease, together with all other payments owing hereunder through the date of such payment of the Agreed Value; and the Lease will terminate upon payment of all such amount; and, upon payment of such amount, title to the Engine will be transferred to Lessee, subject to the rights of affected insurance companies.

10.    NO ABATEMENT OR SET OFF

Unless otherwise expressly provided herein, Lessee will not be entitled to any abatement, reduction of or set off against rents or other payments due Lessor under any circumstances or for any reason whatsoever.

11.    RELEASE AND INDEMNITY

a.    LESSEE HEREBY RELEASES AND AGREES TO INDEMNIFY, DEFEND, AND HOLD LESSOR, ITS INDEMNITEE(S), AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS (COLLECTIVELY, "INDEMNIFIED PARTIES") HARMLESS FROM AND AGAINST ANY AND ALL LIABILITIES, CLAIMS, DEMANDS, SUITS, DAMAGES, AND LOSSES (INCLUDING WITHOUT LIMITATION ALL REASONABLE ATTORNEYS' FEES, COSTS, AND EXPENSES IN CONNECTION THEREWITH OR INCIDENT THERETO), FOR DEATHS OF OR INJURIES TO ANY PERSONS WHOMSOEVER (INCLUDING WITHOUT LIMITATION INDEMNIFIED PARTIES' EMPLOYEES), AND FOR LOSS OF OR DAMAGE TO OR DELAY IN THE DELIVERY OF ANY PROPERTY WHATSOEVER, INCLUDING WITHOUT LIMITATION ANY AIRCRAFT ON WHICH ANY ENGINE MAY BE INSTALLED AND LOSS OF USE THEREOF, (COLLECTIVELY, "LOSSES") IN ANY MANNER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE DELIVERY, LEASING, STORAGE, TRANSPORTING, INSTALLATION, OPERATION, MAINTENANCE, USE, DETACHMENT OR REDELIVERY OF ANY ENGINE WHILE UNDER LEASE, REGARDLESS OF NEGLIGENCE, ACTIVE, PASSIVE, OR ANY OTHER TYPE, OF INDEMNIFIED PARTIES; EXCEPT THAT THE FOREGOING INDEMNITY SHALL NOT APPLY TO THE EXTENT THAT ANY SUCH LOSSES ARE CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF INDEMNIFIED PARTIES.

b.    IN NO EVENT WILL LESSOR BE LIABLE FOR ANY REASON FOR SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, SUCH AS LOST REVENUES, LOST PROFITS, OR LOSS OF PROSPECTIVE ECONOMIC ADVANTAGE, RESULTING FROM PERFORMANCE OR FAILURE TO PERFORM UNDER THIS AGREEMENT.

12.    LIMITED WARRANTY; DISCLAIMER

a.    Lessor warrants that either (i) it will have good title to the Equipment at the time of delivery to Lessee, or (ii) if Lessor is not the owner of the Equipment, Lessor has been authorized by the owner of the Equipment (the "Owner") to lease the Equipment to Lessee and to perform as Lessor hereunder.

b.    The Equipment is leased and accepted by Lessee in "AS IS" condition and with all faults. Lessor makes no warranties whatsoever with respect to any Equipment, express or implied, except the warranty appearing in Section 12.a. above.

c.    THE WARRANTIES SET FORTH IN THIS SECTION 12 AND THE OBLIGATIONS AND LIABILITIES OF LESSOR THEREUNDER ARE EXPRESSLY IN LIEU OF AND LESSEE HEREBY WAIVES AND RELEASES LESSOR FROM ANY AND ALL OTHER WARRANTIES, AGREEMENTS, GUARANTEES, CONDITIONS, DUTIES, OBLIGATIONS, REMEDIES OR LIABILITIES, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY AND FITNESS FOR INTENDED USE, WITH RESPECT TO ANY EQUIPMENT LEASED HEREUNDER OR LESSOR'S PERFORMANCE HEREUNDER. NO AGREEMENT OR UNDERSTANDING VARYING, ALTERING, OR EXTENDING LESSOR'S LIABILITY WILL BE BINDING ON LESSOR UNLESS IN WRITING AND SIGNED BY LESSEE'S AND LESSOR'S DULY AUTHORIZED OFFICER OR REPRESENTATIVE.

6

d.  Upon Lessee's request and provided that Lessee is not in default under this GTA or any Lease hereunder, Lessor will reasonably assist Lessee in processing claims and enforcing rights of Lessor arising under any existing manufacturer's or overhaul agency warranties for any Engine leased hereunder; provided always that Lessee will indemnify Lessor for any reasonable costs and expenses incurred by Lessor in connection therewith. With respect to any such warranties, it is understood that, except as specifically provided in this Section 12.d., Lessor will have no further liabilities to Lessee.

13.  FORCE MAJEURE

Lessor will not be liable for failure to perform or any delays in performance hereunder due to acts of God, the public enemy, war or warlike operations, failure of suppliers to timely deliver or other inability to secure parts or material, insurrection or riots, floods, explosions, fires, earthquakes, any governmental act, failure of transportation, strikes or other labor disputes, acts or omissions of Lessee or any other cause beyond Lessor's control.

14.  INSURANCE

a.  Lessee will procure and maintain in full force and effect during the term of each Lease and shall pay all premiums for, policies of insurance of the type and in the minimum amounts stated below and with companies acceptable to Lessor and under terms reasonably satisfactory to Lessor:

   i.  Comprehensive Airline Liability Insurance including premises, passengers, autos on airport premises, personal injury, war risk and allied perils, contractual, and cargo liability with an aggregate limit of not less than the Liability Limit stated in the Lease, naming Indemnified Parties (as defined in Section 11.a. herein) as additional insureds.

   ii.  Aircraft Hull Insurance covering all risks of loss or damage, while on the ground or in flight, to the Engine in a minimum amount not less than the Agreed Value stated in the Lease for such Engine. Such policy will include Lessor as loss payee as its interest may appear. The Agreed Value of the Engine will be in addition to the insured value of any aircraft to which it is attached.

   iii.  Aircraft Hull War Risk, Hijack and Confiscation (including government of registry) Insurance covering the Engine in a minimum amount not less than the Agreed Value stated in the Lease for such Engine. Such policy will include Lessor as loss payee as its interests may appear. The Agreed Value of the Engine will be in addition to the insured value of any aircraft to which it is attached.

   iv.  All Risk Spares Insurance, including War Risk and Allied Perils (including confiscation by government of registry) and in transit coverage, on the Equipment covering any damage which may occur while in Lessee's care, custody, and control but not then attached to an aircraft in a minimum amount not less than the Agreed Value stated in the Lease for such Equipment. Such policy will include Lessor as loss payee as its interests may appear.

b.  Liability policies will include the following special provisions:

   i.  Contractual liability specifically covering obligations assumed by Lessee in Section 11 above.

   ii.  War Risk exclusion write-back with third party coverage at full policy limits.

   iii.  Breach of Warranty provision as respects the Lessor.

   iv.  Primary Without Right of Contribution Clause.

   v.  30-day advance written notice of cancellation or adverse material change (based on the date of delivery of the notice to Lessor).



    vi.      Severability of Interest clause.

    vii.    Premium setoff/counterclaim clause.

c.    Hull, Hull War Risk, and Spares policies will include the following special provisions:

    i.      Waiver of Subrogation.

    ii.     Breach of Warranty provision as respects the Lessor.

    iii.    30-day advance written notice of cancellation or adverse material change except for 7 days for War Risk coverage (based on the date of delivery of the notice to Lessor).

    iv.    All losses will be adjusted with Lessor and Lessee.

    v.     Aircraft Hull and War Risk policies shall contain the "50/50" clause.

    vi.    Premium setoff/counterclaim clause.

d.    In respect of reinsurance (if any), all reinsurance will:

    i.      Provide that cover shall be identical to the cover provided by the original insurances and be subject to the same terms and conditions as the original insurances.

    ii.     Provide that so far as the respective interest of the additional insureds are concerned, the reinsurance shall not be invalidated by any act, neglect, omission, misrepresentation or non-disclosure on the part of the reinsured party.

    iii.    Provide that in respect of All Risks Aircraft Hull Insurance, Aircraft Hull War Risk and Allied Perils Insurance as described above and All Risks Insurance on any Engine as described above, the reinsurers and the reinsured hereby agree that in the event of any claim arising under the relevant reinsurances the reinsurers shall in lieu of payment to the reinsured, its successors in interest and assigns pay to the Loss Payee specified in the primary insurances all sums payable under or in connection with such reinsurances by virtue of any reinsured loss of, or damage to, the Engines, without any deduction or deductions whatsoever, other than any outstanding premia in respect of the Engines the subject of the claim, it being understood and agreed that any such payment by the reinsurers shall fully discharge and release the reinsurers from any and all further liability in connection therewith.

    iv.    Provide that in respect of Comprehensive Airline Liability Insurance as described above, the reinsurers and reinsured hereby agree that in the event of any claim arising under the relevant reinsurances, the reinsurers shall in lieu of payment to the reinsured, its successors in interest and assigns pay to the person or party who has sustained the relevant loss (or as reimbursement of any payment made by any additional insured) all sums payable under such reinsurances by virtue of such reinsured loss, without any deduction or deductions whatsoever, it being understood and agreed that any such payment by the reinsurers shall fully discharge and release the reinsurers from any and all further liability in connection therewith.

    v.     Provide that the reinsurers and reinsured agree that in the event that the reinsured, its successors in interest and assigns shall at any time be or become insolvent or suspend business or file a petition in bankruptcy or be adjudicated insolvent or bankrupt or admit in writing its inability to pay its debts as they become due, or make a general assignment for the benefit of creditors or should a receiver or liquidator or assignee or trustee or state commissioner of insurance be appointed in respect of the reinsured, its successors in interest or assigns or any substantial part of its property for the purpose of liquidation on account of insolvency, then the reinsurers, in lieu of payment to the reinsured, its successors in interest or assigns, shall pay upon demand that portion of any loss due to the

party entitled thereto under the terms of the original insurance for which such reinsurers would under the terms of the reinsurance be liable to pay the reinsured, its successors in interest or assigns, less any amounts already paid, it being understood and agreed that any such direct payment by reinsurers shall fully discharge and release the reinsurers from any and all further liability for such payment made.

e.     Lessee will provide Lessor with certificates of insurance from insurers (and reinsurers, if applicable) satisfactory to Lessor evidencing the above coverages. The certificates will identify the Lease by date and the Engine by make, model, and serial number. Lessee will also direct its insurance broker to certify that an aircraft hull upon which the Engine is mounted is insured in an amount to include the agreed value of the Engine.

f.     Lessee's above-described insurance obligations may be satisfied by a sublessee (if said sublessee has been approved by Lessor in accordance with Section 17 herein).

## 15.    TITLE TO EQUIPMENT

Title to Equipment will remain vested in Lessor (or the Owner, if Lessor is not the owner of the Equipment) at all times. Lessee will not permit any lien, claim, mortgage, or encumbrance ("Liens") except those Liens arising by or through Lessor (or Owner) to attach to any Equipment. Lessee will indemnify Lessor and Owner for any damages suffered by Lessor or Owner, including costs and expenses incident thereto, occurring as a result of any such Liens. Lessee's rights will be solely those of a lessee and nothing contained herein is intended or will be interpreted as granting to Lessee any other right, title, or interest in or to any Equipment, whether legal or equitable. Lessor will affix a placard to each Engine and Lessee will assure the placard remains attached to the Engine during the Lease Term, such placard to read as follows:

"THIS ENGINE IS OWNED BY A SUBSIDIARY OF AAR CORP., 1100 N. WOOD DALE ROAD, WOOD DALE, ILLINOIS 60191, (630) 227-2000." or alternate language if Lessor is not the owner of the Engine.

## 16.    TAXES

The charges set forth herein and in each Lease, including the Daily Rent, Transaction Fee, and Use Fee, do not include the amount of any duties, charges, imposts, or sale, use, excise, transfer, gross receipts, or any other taxes or charges which may be imposed by any governmental jurisdiction in connection with the lease of any Equipment. Lessee will indemnify, defend, and hold Lessor harmless from and against any and all taxes of whatsoever kind or nature, including costs or expenses incurred in connection therewith, except taxes based on the net income of Lessor, which may be assessed against, chargeable to, or collectible from either Lessee or Lessor by any taxing authority, foreign, federal, state, or local, and which are based upon, levied, or assessed with respect to the lease of any Equipment or the operation, possession, or use of such Equipment while under any Lease. Upon demand of any governmental authority for payment of any such tax or charge, Lessor will immediately notify Lessee and Lessee will pay the same; provided, however, that in the event that Lessor is required to pay the same, Lessor will invoice Lessee for the amount of such tax or charge paid by it and Lessee will immediately reimburse Lessor for such amount. Lessee may contest payment of any such tax or charge or may request Lessor to pay the same under protest on Lessee's behalf.

## 17.    SUBLEASES; ASSIGNMENT

a.     Lessor shall have the right to novate or assign any Lease, and Lessee shall execute such reasonable documents as are necessary to effectuate such novation or assignment. Further, Lessee shall cause its Lease-related insurance certificates to be promptly revised to appropriately name novatees, assignees, lenders, or other parties having an interest in the Lease as additional insureds and/or loss payees, as such parties have been made known to Lessee by Lessor.

b.     Lessee will not assign this GTA or any Lease in whole or in part, sublease any Equipment or otherwise relinquish possession thereof to anyone other than Lessor for any purpose except with the prior written consent of Lessor, and any such attempted assignment or sublease will be null and void. If a sublease is authorized by Lessor, (i) the sublease shall be subject and subordinate in all respects to the terms of the Lease, and (ii) Lessee shall at all times remain liable for the performance of its obligations under the Lease.

9

18.    RETURN OF EQUIPMENT

a.    Lessee will perform or cause to be performed on each Engine immediately prior to its return to Lessor, a full (compressor and turbine section) borescope inspection and a full test cell run as described below:

| Manufacturer | Engine Model | Test Number | Manual Reference |
|---|---|---|---|
| Pratt & Whitney | JT8D | 06 | Engine Manual |
| | JT9D | 20 | Engine Manual |
| | PW2000 | 09 | Engine Manual |
| | PW4000 | 09 | Engine Manual |
| IAE Intl. Aero Engines | V2500 | Functional Test No. 12 | Task 71-00 00-700-012-B00 of the V2500 Engine Manual |
| Rolls Royce | RB211-535E4 | Full Performance | RB211-535E4 Engine Shop Manual |
| General Electric | CF6-6,50 | 007 | Task Numbered Shop Manual |
| | CF6-80 | 003, 004, 006, and 007 | Task Numbered Shop Manual |
| CFMI | CFM56 | Engine acceptance test | CFM56 Engine Shop Manual (applicable to the specific engine type) |

or comparable tests that are specified by other engine manufacturers for their engines. The borescope inspection and test cell run shall be performed by a repair facility acceptable to Lessor; and Lessee shall obtain Lessor's prior written approval for said repair facility. Lessee will provide Lessor with at least 3 business days advance written notice of such Engine inspection and test, so that Lessor may have the opportunity to witness same. If the borescope inspection or test cell run identifies an Engine defect, Lessee will immediately notify Lessor of the findings. If during the Lease Term for any Engine, such Engine has not been installed on an aircraft, has not suffered any damage, and has not been involved in an accident, performance of a borescope inspection and test cell run will not be required.

Notwithstanding the foregoing, Lessee is not required to subject the Engine to a full test cell run prior to redelivery of the Engine to Lessor if the Engine were last removed from service by Lessee due to Normal Wear and Tear or due to a Mandatory Change (however, a borescope inspection and borescope report are still required).

b.    Upon expiration of the Lease Term or other valid termination of a Lease, Lessee will return the leased Equipment to the redelivery location described in the applicable Lease.

c.    In addition to any other requirements of this GTA, upon return of the Equipment to Lessor, the Engine will be accompanied by the following documentation:

i.    Either an FAA 8130-3 Form, or a EASA Form 1 with FAA dual release statement;

ii.    An FAA Form 337 or an equivalent acceptable to Lessor, in Lessor's sole discretion (if applicable, based on repairs that may have been performed on the Engine during the Lease);

iii.    A signed Non-Incident Statement, in the form of Exhibit C, from each party that operated the Engine during the Lease Term; and

iv.    An "Engine Condition Checklist" (form provided by Lessor) detailing the performance of the Engine redelivery inspection; provided, however, this checklist shall not be required if Lessor did not provide a similar checklist to Lessee at commencement of the Lease Term.



NO. DE FAX :    13 AGO. 2000 01:00PM P1

except that such serviceable documentation shall not be required if the Engine has been rendered unserviceable due to Normal Wear and Tear or due to a Mandatory Change.

d.   Prior to returning the Equipment to Lessor, Lessee will prepare each Engine for shipment by (i) capping and plugging all openings of the Engine; (ii) preserving the Engine for storage for more than ninety (90) days (that is, Pratt & Whitney "Level 4", General Electric Subtask 72-00-00-620-053 for an "operable engine", or comparable preservation specifications by other engine manufacturers); (iii) completely covering the Engine with a tarpaulin; and (iv) otherwise preparing the Engine for shipment in accordance with the manufacturer's specifications/recommendations.  Any trucks used for shipment of the Engine will be equipped with air ride or air cushion trailers.  On any given shipment, such truck will be dedicated to Engines belonging solely to Lessor, except that additional items may be transported on the truck, provided that (a) the Engine may be off-loaded at the redelivery location without disturbing any of the additional items and (b) Lessor will not handle or reposition any of the additional items on the truck.

e.   If the Engine is a JT9D that has been operated during the Lease Term and is subject to the requirements of AD #94-26-06 or AD #92-19-02 R1 (Diffuser Case Rear Rail Inspection) as amended, Lessee will return such Engine with at least fifty (50) cycles remaining until the next Diffuser Case Rear Rail Inspection.

f.   Notwithstanding anything to the contrary in the GTA, if Engine parts shortages ("Missing Parts") are identified at redelivery of the Engine to Lessor and Lessee does not cause the Missing Parts to be replaced within five (5) business days after Lessor notifies Lessee of the Missing Parts, Lessor may, at its option, replace the Missing Parts at Lessee's sole expense. Lessee shall pay Lessor for Lessor's cost to replace the Missing Parts immediately upon receipt of Lessor's invoice for same.

19.  <u>TERMINATION AND ADDITIONAL ASSURANCES</u>

a.   Any of the following events shall constitute an event of default under a Lease ("Event of Default"):

i.   Lessee shall fail to make any payment of Daily Rent, Use Fees or other payments due under a Lease; or

ii.   Lessee shall fail to observe or perform any of the covenants or agreements of Lessee set forth in Sections 14, 17.5 or 18 hereof, or

iii.   Lessee shall fail to perform or observe any other covenant, condition, or agreement to be performed or observed by it under a Lease, or in any agreement or certificate furnished to Lessor in connection herewith, and such failure shall continue unremedied for five (5) days after written notice to Lessee by Lessor specifying such failure and demanding the same to be remedied; or

iv.   A default by Lessee or its affiliates or subsidiaries under any agreement between Lessor and Lessee (or between any of their respective affiliates or subsidiaries); or

v.   Lessee shall become insolvent or make an assignment for the benefit of creditors or consent to the appointment of a trustee or receiver, or a trustee or a receiver shall be appointed for Lessee or for a substantial part of its property without its consent and shall not be dismissed for a period of 60 days, or any petition for the relief, reorganization or arrangement of Lessee, or any other petition in bankruptcy or for the liquidation, insolvency or dissolution of Lessee shall be filed by or against Lessee and, if filed against Lessee shall be consented to or be pending and not dismissed for a period of 60 days, or an order for relief under any bankruptcy or insolvency law shall be entered by any court or governmental authority of competent jurisdiction with respect to Lessee; or any execution or writ or process shall be issued under any action or proceeding against Lessee whereby any of the Equipment may be taken or restrained; or Lessee's  corporate existence shall cease; or Lessee shall (whether in one transaction or a series of transactions), without Lessor's prior written consent, sell, transfer, dispose of, pledge or otherwise encumber, all or substantially

11



all of its assets or property, or consolidate or merge with any other entity, or become the subject of, or engage in, a leveraged buy-out or any other form of corporate reorganization.

If an Event of Default has occurred, Lessor may repossess the Equipment with or without terminating the Lease, or terminate this GTA and all Leases immediately upon written notice and take such other action as may be permitted by this GTA or applicable law. The right of each party to require strict performance of any obligations hereunder will not be affected in any way by any previous waiver, forbearance, or course of dealing.

b.    If Lessee becomes insolvent; if Lessor has evidence that Lessee is not paying its bills when due without just cause; if a receiver of Lessee's assets is appointed; if Lessee takes any step leading to its cessation as a going concern; if Lessee either ceases or suspends operations for reasons other than a strike; then Lessee will forthwith give adequate assurance of the future performance of this GTA and all Leases by establishing an irrevocable letter of credit — issued by a bank and on terms and conditions acceptable to Lessor, and in an amount sufficient to cover all amounts potentially due from Lessee under this GTA and all Leases — that may be drawn upon by Lessor if Lessee does not fulfill its obligations under this GTA and all Leases in a timely manner. If Lessee does not provide the letter of credit or such other security reasonably acceptable to Lessor within twenty-four (24) hours of the happening of any such event, this GTA and all Leases hereunder will be terminated as of the happening of such event.

20.    REPOSSESSION OF EQUIPMENT

a.    In the event of any failure of Lessee to redeliver any leased Equipment to Lessor at the time required under Section 2 hereof, or in exercise of Lessor's right to repossess the Equipment under Section 19.a. above, Lessor may, without notice to Lessee, in addition to the exercise of any remedies available under law, enter upon the premises where such Equipment is located and take immediate possession of and remove such Equipment, without liability to Lessee for or by reason of such entry or taking possession, whether for the restoration of damage to property caused by such taking or otherwise, and Lessee consents to such action.

b.    To the extent permitted by law, Lessee hereby agrees that, in the event an order for relief is entered against it in a proceeding under Title 11 of the United States Code or under a similar statute in a foreign jurisdiction or any superseding statutes of any of the foregoing, Section 1110 of Title 11 of the United States Code or a similar statute in a foreign jurisdiction, as amended from time to time, shall be applicable and Lessor will have the right to take possession of the Equipment in compliance with the provisions of this GTA and Section 1110 (or the applicable foreign statute). Lessee further agrees that neither it nor any successor will take a contrary position in any bankruptcy proceedings, nor will it take any action to interfere with Lessor's rights under such Section.

21.    NOTICES

All notices or requests given in connection with this GTA or any Lease will be given in writing and sent prepaid by certified mail return receipt requested, telegram, teletype, telex, cable, facsimile transmission, or electronic mail to the addresses listed below unless either party notifies the other party of a different address.

For Lessor:    AAR Parts Trading, Inc.
One AAR Place
1100 N. Wood Dale Road
Wood Dale, Illinois 60191
Attn:    Vice President, Contract Administration
Fax:    630-227-2338
Email:    jprostoff@aarcorp.com

*KN*

For Lessee:    Lineas Aereas Azteca S.A. de C.V.
               Aviacion General Zona Hangares
               "C" No. 27
               Mexico D.F. 15620, Mexico
               Attn:   Chief Executive Officer
               Fax:    52-22-5716-9736

22.   RECORDING

Lessor intends to record all Leases with the following agencies:

(i)     Department of Transportation, Federal Aviation Administration, FAA Engine Registry; Oklahoma
        City, Oklahoma;

(ii)    the International Registry (as established pursuant to the terms of the Convention on International
        Interests in Mobile Equipment and the Protocol to the Convention on International Interests in Mobile
        Equipment on Matters Specific to Aircraft Equipment (the "Cape Town Convention"); and

(iii)   if Lessee is located outside of the United States, Lessor may record certain Leases with the
        appropriate government agency of the country in which Lessee is located.

If Lessee is not already registered with the International Registry, Lessee will register itself with the
International Registry. Further, Lessee will execute such documents and take such steps as may be
reasonably requested by Lessor and will otherwise cooperate with Lessor as Lessor may reasonably direct,
to effectuate the recordation undertaken by Lessor. Upon the termination of this GTA or any Lease for any
reason whatsoever, each of the parties will execute and deliver to the other party promptly such documents
and/or take such actions as the other party may reasonably request in order to file a termination of this GTA
or any Lease with the FAA, other applicable government agencies, and/or the International Registry.

23.   BROKERS/FINDERS

Lessee and Lessor each indemnifies the other party from liability for fees, commissions or other claims made
upon the other by third party brokers or finders when such claims were caused by the indemnifying party.

24.   APPLICABLE LAW

This GTA and all Leases will be deemed to have been entered into and performed in the State of Illinois and
will be construed in accordance with the laws of Illinois.

25.   JURISDICTION AND VENUE

The parties agree that any state or federal court located in the State of Illinois shall have jurisdiction to hear
any suit, action, or proceeding arising out of or in connection with this GTA or any Lease. Each party hereby
acknowledges and irrevocably consents and submits to the jurisdiction of any such court in any such suit,
action, or proceeding. Service of process may be made against a party either in person, wherever such party
may be found, or by notice as permitted herein to the address of the party set forth in this GTA.

26.   CONFIDENTIALITY

The GTA and any Leases hereunder and all information contained in this GTA and any Leases hereunder
are confidential and proprietary to Lessor and are solely for the internal use of the parties hereto. Disclosure
to third parties is prohibited, except as otherwise stated in this GTA or any Leases, as required by law or
order of a governmental authority, or as required to enforce the terms of the GTA and any Leases hereunder.

27.   FINANCIAL INFORMATION

Lessee agrees to furnish Lessor, within one hundred twenty (120) days after the last day of each fiscal year
of Lessee, a copy of the consolidated balance sheet of Lessee and its consolidated subsidiaries as of the

13

end of such fiscal year, and related consolidated statements of income and retained earnings of Lessee and its consolidated subsidiaries for such fiscal year, certified by an independent certified public accounting firm of recognized standing, each on a comparative basis with corresponding statements for the prior fiscal year, and, if applicable, a copy of Lessee's annual report and form 10-K filed with the Securities and Exchange Commission for such fiscal year or such equivalent form as may be required by the government of the country in which Lessee is incorporated or otherwise organized. All reports shall be submitted to Lessor in accordance with Section 21 herein (Notices).

28.     MISCELLANEOUS

a.     This GTA and each Lease entered into hereunder contain the entire understanding of the parties with respect to such Lease and no warranties, representations or undertakings have been made by either party except as expressly set forth in this GTA and the respective Lease(s) entered into hereunder. Any previous or contemporaneous oral or written communications, representations, agreements or understandings between Lessor and Lessee relating to this GTA and any Lease thereunder are no longer of any force and effect and are superseded and replaced in their entirety by the provisions of the GTA and the applicable Lease.

b.     This GTA has been negotiated between the parties, each party having had the benefit of legal counsel. The construction or interpretation of any clause or provision of this GTA or any Lease will not be construed or resolved against Lessor solely because Lessor drafted any such clause or provision or otherwise prepared or caused the GTA or Lease documents to be drafted.

c.     This GTA and any Lease may not be amended in whole or in part orally, but only by an express instrument in writing signed by the parties hereto.

d.     This GTA will be binding upon and inure to the benefit of the respective permitted successors and assigns of the parties.

e.     This GTA and any Lease hereunder may be executed in counterparts. Such counterpart documents, when taken together, will constitute one and the same instrument. A facsimile signature on any counterpart will be deemed an original for all purposes.

f.     The terms contained in this GTA and any Lease that, by their nature, continue after termination or expiration thereof or redelivery of the Equipment to Lessor will survive such termination, expiration, or redelivery and continue in full force and effect.

g.     The remedies afforded a nonbreaching party are cumulative and in addition to all other rights in law, equity or otherwise.

h.     The prevailing party in any litigation to enforce the terms of this GTA shall be entitled to recover its reasonable and actual attorney's fees from the losing party.

* * *



KN

14

DE :                                NO. DE FAX :                13 AGO. 2000 01:03PM F

General Terms Engine Lease Agreement
Contract No. 28026

IN WITNESS WHEREOF, the parties have executed this General Terms Engine Lease Agreement the day and year first above written.

AAR Parts Trading, Inc.                          Lineas Aereas Aztecas S.A. de C.V.

By: _James N. Vincent_                           By: _____
Name: JAMES N. VINCENT                           Name: Marisho E. López Pineda
Title:   U.P.                                    Title:   C.E.O.

COUNTERPART NO. ____ OF ____ SERIALLY NUMBERED MANUALLY EXECUTED COUNTERPARTS. TO THE EXTENT IF ANY THAT THIS DOCUMENT CONSTITUTES CHATTEL PAPER UNDER THE UNIFORM COMMERCIAL CODE, NO SECURITY INTEREST IN THIS DOCUMENT MAY BE CREATED THROUGH THE TRANSFER AND POSSESSION OF ANY COUNTERPART OTHER THAN COUNTERPART NO. 1.

OCT-19-2006 JUE 04:22PM ID:                                           PAG.:2

EXHIBIT A to General Terms Engine Lease Agreement

# AIRCRAFT ENGINE LEASE AGREEMENT

## CONTRACT NUMBER _____

THIS AIRCRAFT ENGINE LEASE AGREEMENT ("Lease") is made and entered into as of _____, 200_, by and between:

## AAR PARTS TRADING, INC. ("Lessor")
### and
## LINEAS AEREAS AZTECA S.A. DE C.V. ("Lessee")

I.     AGREEMENT TO LEASE:  Lessor hereby leases to Lessee and Lessee hereby leases from Lessor the Equipment described in ARTICLE IV herein, subject to the terms and provisions of this Lease.  This Lease is entered into pursuant to the General Terms Engine Lease Agreement dated _____, 200_, (the "GTA") between Lessor and Lessee which is hereby incorporated herein by reference.  Capitalized terms used herein but not defined shall have the same meaning as in the GTA.  In the event of any conflict in terms between the GTA and this Lease, the terms of this Lease shall prevail.

II.    LEASE TERM:  The term of this Lease will be for a period of _____ days, commencing on the date the Engine is delivered to Lessee at the Delivery Location (the "Delivery Date").

III.   DELIVERY/REDELIVERY LOCATIONS:  The term of this Lease will be for a period of _____ days, commencing on the date the Engine is delivered to Lessee at the Delivery Location, upon notification by Lessor that Lessee has satisfied the conditions described in Section 3.c. of the GTA and _____ (the "Delivery Date").

IV.    TYPE OF EQUIPMENT (which has 750 or more rated takeoff horsepower):

| Make | Model | Configuration | Engine Serial No. | Total Time Since New | Total Cycles Since New |
|------|-------|---------------|-------------------|----------------------|------------------------|
|      |       |               |                   |                      |                        |

V.     LOANED ENGINE STAND:  Serial Number _____

VI.    INSPECTION PERIOD:  __ hours after the Delivery Date.

VII.   ADDITIONAL TERMS AND CONDITIONS:  See Schedule 1 attached hereto.

IN WITNESS WHEREOF, the parties have executed this Lease on the date first above written.

AAR PARTS TRADING, INC.                    LINEAS AEREAS AZTECA S.A. DE C.V.

By: _____        By:_____
   Name:                                      Name:
   Title:                                     Title:

## SCHEDULE 1 TO
## AIRCRAFT ENGINE LEASE AGREEMENT - CONTRACT NO. _____

The following additional terms and conditions apply to the Aircraft Engine Lease Agreement - Contract No. _____ for ESN _____:

A.     <u>LEASE CHARGES</u>:

      Transaction Fee:           $_____
      Daily Rent:                 $_____/day
      Use Fee:                 $_____/hour or cycle
      Security Deposit:        $_____

      Initial Payment:         $_____

B.     <u>AGREED VALUE</u>:        $_____

C.     <u>LIABILITY LIMIT</u>:       $_____ per occurrence

AAR PARTS TRADING, INC.                     LINEAS AEREAS AZTECA S.A. DE C.V.

By _____              By _____
Name:                                       Name:
Title:                                      Title:

EXHIBIT B to General Terms
Engine Lease Agreement

# ENGINE DELIVERY RECEIPT

FROM:          Lineas Aereas Azteca S.A. de C.V.

TO:            AAR Parts Trading, Inc.

The undersigned hereby acknowledges that on this _____ day of _____, 200____, AAR Parts Trading,

Inc. ("AAR") did deliver to Lineas Aereas Azteca S.A. de C.V. that certain _____ Engine Manufacturer's

Serial    No.    _____    and    Engine    Stand    with    Serial    No.    _____    at

_____.    The undersigned does hereby further acknowledge that he/she has

received and does hereby accept delivery of the aforesaid Engine and Engine Stand.

Signed this ___ day of _____, 200_, at _____.

By:_____
Name:
Title:

Exhibit C to General Terms
Engine Lease Agreement

# NON-INCIDENT STATEMENT

During the term of the Aircraft Engine Lease Agreement - Contract No. _____ *[During the period from _____ to _____]*, the engine described below (the "Engine") (a) was not involved in an incident or accident; that is, the Engine was not involved in an event which resulted in the Engine being deemed by the manufacturer as unacceptable for continued aircraft usage, and (b) was never subjected to military or government operation.

| ENGINE TYPE | ENGINE SERIAL NO. | TSN | CSN |
|---|---|---|---|
|  |  |  |  |

_____ [Operator]

By _____
Name:
Title:

# EXHIBIT  B

# AIRCRAFT ENGINE LEASE AGREEMENT
## CONTRACT NUMBER 28027

THIS AIRCRAFT ENGINE LEASE AGREEMENT ("Lease") is made and entered into as of October 19, 2006, by and between:

### AAR PARTS TRADING, INC. ("Lessor")
### and
### LINEAS AEREAS AZTECA S.A. DE C.V. ("Lessee")

I.      AGREEMENT TO LEASE:  Lessor hereby leases to Lessee and Lessee hereby leases from Lessor the Equipment described in ARTICLE IV herein, subject to the terms and provisions of this Lease.  This Lease is entered into pursuant to the General Terms Engine Lease Agreement dated October 10, 2006, (the "GTA") between Lessor and Lessee which is hereby incorporated herein by reference.  Capitalized terms used herein but not defined shall have the same meaning as in the GTA.  In the event of any conflict in terms between the GTA and this Lease, the terms of this Lease shall prevail.

II.      LEASE TERM:  The term of this Lease will commence on the date the Engine is delivered to Lessee at the Delivery Location, upon notification by Lessor that Lessee has satisfied the conditions described in Section 3.c. of the GTA (the "Delivery Date").  The term of this Lease will expire upon the expiration of life on any one of the Engine's life limited parts.

III.      DELIVERY/REDELIVERY LOCATIONS:  The Engine will be delivered to Lessee F.O.B. Lessee's facility at Mexico City, Mexico (the "Delivery Location"); and upon termination of the Lease, the Engine will be redelivered to Lessor by Lessee F.O.B. Lessor's facility at Wood Dale, Illinois USA (the "Redelivery Location").

IV.      TYPE OF EQUIPMENT (which has 750 or more rated takeoff horsepower):

| Manufacturer | Model | Configuration | Engine Serial No. | Total Time Since New | Total Cycles Since New |
|---|---|---|---|---|---|
| CFMI | CFM56-3B2 | 737-300 QEC less cowls | 858374 | 26,727.2 | 15,470 |

V.      LOANED ENGINE STAND:  Serial Number to be advised.

VI.      INSPECTION PERIOD:  72 hours after the Delivery Date.

VII.      ADDITIONAL TERMS AND CONDITIONS:  See Exhibit AA attached hereto.

IN WITNESS WHEREOF, the parties have executed this Lease on the date first above written.

AAR PARTS TRADING, INC.

By: _____
Name:
Title:
**JAMES N. VINCENT
VICE PRESIDENT**

LINEAS AEREAS AZTECA S.A. DE C.V.

By: _____
Name: EDUARDO CHAVEZ BARRIENTOS
Title: DIRECTOR GENERAL.

COUNTERPART NO. ____ OF ____ SERIALLY NUMBERED MANUALLY EXECUTED COUNTERPARTS.  TO THE EXTENT IF ANY THAT THIS DOCUMENT CONSTITUTES CHATTEL PAPER UNDER THE UNIFORM COMMERCIAL CODE, NO SECURITY INTEREST IN THIS DOCUMENT MAY BE CREATED THROUGH THE TRANSFER AND POSSESSION OF ANY COUNTERPART OTHER THAN COUNTERPART NO. 1.

**EXHIBIT AA TO**
**AIRCRAFT ENGINE LEASE AGREEMENT - CONTRACT NO. 28027**

The following additional terms and conditions apply to the Aircraft Engine Lease Agreement - Contract No. 28027 for ESN 858374:

A.    LEASE CHARGES:

Transaction Fee:          None

Daily Rent:               $1,600.00 per day

Use Fee:                  $135.00 per hour, and
                          $45.00 per cycle

Security Deposit:         $96,000.00

Initial Payment:          $144,000.00 (including Security Deposit)

B.    AGREED VALUE:       $3,200,000.00

C.    LIABILITY LIMIT:    $500,000,000.00 per occurrence

D.    CONDITIONS PRECEDENT TO SHIPMENT:

The conditions described in Section 3.c. of the GTA shall be satisfied by Lessee before the Engine is shipped by Lessor to the Delivery Location.

E.    RETURN CONDITIONS:

Notwithstanding anything to the contrary in Section 18 of the GTA, Lessee may perform a maximum power assurance run on the Engine at redelivery in lieu of a full performance test cell run.

AAR PARTS TRADING, INC.                    LINEAS AEREAS AZTECA S.A. DE C.V.

By _____                   By _____
Name: _____                Name: _____
Title: _____               Title: _____
      JAMES N. VINCENT
      VICE PRESIDENT

*COUNTERPART NO. ___ OF ___ SERIALLY NUMBERED MANUALLY EXECUTED COUNTERPARTS. TO THE EXTENT IF ANY THAT THIS DOCUMENT CONSTITUTES CHATTEL PAPER UNDER THE UNIFORM COMMERCIAL CODE, NO SECURITY INTEREST IN THIS DOCUMENT MAY BE CREATED THROUGH THE TRANSFER AND POSSESSION OF ANY COUNTERPART OTHER THAN COUNTERPART NO. 1.*

**EXHIBIT AA TO**
**AIRCRAFT ENGINE LEASE AGREEMENT - CONTRACT NO. 28027**

*THIS EXHIBIT IS INTENTIONALLY BLANK FOR FAA FILING PURPOSES.*

KN

# EXHIBIT  C



June 11, 2007


Lineas Aereas Azteca S.A. de C.V.
Aviacion General Zona Hangares
"C" No. 27
Mexico D.F. 15620, Mexico
Attn: Chief Executive Officer

SUBJECT:    NOTICE OF DEFAULT and TERMINATION OF LEASE

Dear Sir:

This is to notify you that Lineas Aereas Azteca S.A. de C.V. ("Lessee") is in default of the Aircraft Engine Lease Agreement - Contract No. 28027, dated as of October 19, 2006, between AAR Parts Trading, Inc. ("Lessor") and Lessee (the "Lease") with respect to engine serial number 858374 (the "Engine").

In particular, Lessee has failed to keep its insurance in effect, as required by Section 14 of the General Terms Engine Lease Agreement – Contract No. 28026, dated as of October 10, 2006 (the "GTA"), the terms of which GTA are incorporated in the Lease. Lessee's failure to keep its insurance in effect constitutes an Event of Default in accordance with Section 19.a.ii. of the GTA.

In accordance with Section 19.a. of the GTA, Lessor terminates the Lease, effective immediately.

In addition to such termination remedy, Lessor may exercise such other rights and remedies available to it under the Lease or under law, including the right to amounts due under the Lease as of the date of termination. Lessor demands that Lessee immediately ship the Engine to AAR's facility at 1100 N. Wood Dale Road, Wood Dale, Illinois 60191 USA.

Sincerely,

James N. Vincent
Vice President

# EXHIBIT  D

 **AAR**®

October 11, 2007

Lineas Aereas Azteca S.A. de C.V.
Aviacion General Zona Hangares
"C" No. 27
Mexico D.F. 15620, Mexico
Attn:   Marcelo Manfredi
        Julio Berthely

SUBJECT:   NOTICE OF DEFAULT and TERMINATION OF LEASE
           **SECOND NOTICE**

Dear Mr. Manfredi:

Attached please find a copy of the Notice of Default and Termination of Lease letter that AAR Parts Trading, Inc. ("AAR") sent to Lineas Aereas Azteca S.A. de C.V. ("Azteca") on June 11, 2007, relating to the Aircraft Engine Lease Agreement – Contract No. 28027 (the "Lease") with respect to engine serial number 858374 (the "Engine").

The terms of the attached  Notice of Default and Termination of Lease letter dated June 11, 2007 are incorporated herein.

AAR hereby demands that Azteca immediately relinquish custody of the Engine to AAR or AAR's designated agent.  Please confirm that Azteca will cooperate with AAR and will permit AAR or AAR's designated agent to immediately remove the Engine from Azteca's hangar.

AAR hereby expressly reserves every right, power and remedy provided under the Lease or now or hereafter existing at law, in equity or by statute and each and every right, power and remedy, whether specifically provided under the Lease or otherwise existing, which may be exercised from time to time and as often and in such order as may be deemed expedient by AAR, and the exercise or the beginning of the exercise of any right, power or remedy shall not be construed as a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.

We look forward to receiving your favorable response at your earliest convenience.

Sincerely,

James N. Vincent
Vice President

cc:   Lineas Aereas Azteca
      Mariano Ladron de Guevara



June 11, 2007

Lineas Aereas Azteca S.A. de C.V.
Aviacion General Zona Hangares
"C" No. 27
Mexico D.F. 15620, Mexico
Attn: Chief Executive Officer

SUBJECT:    NOTICE OF DEFAULT and TERMINATION OF LEASE

Dear Sir:

This is to notify you that Lineas Aereas Azteca S.A. de C.V. ("Lessee") is in default of the Aircraft Engine Lease Agreement - Contract No. 28027, dated as of October 19, 2006, between AAR Parts Trading, Inc. ("Lessor") and Lessee (the "Lease") with respect to engine serial number 858374 (the "Engine").

In particular, Lessee has failed to keep its insurance in effect, as required by Section 14 of the General Terms Engine Lease Agreement – Contract No. 28026, dated as of October 10, 2006 (the "GTA"), the terms of which GTA are incorporated in the Lease. Lessee's failure to keep its insurance in effect constitutes an Event of Default in accordance with Section 19.a.ii. of the GTA.

In accordance with Section 19.a. of the GTA, Lessor terminates the Lease, effective immediately.

In addition to such termination remedy, Lessor may exercise such other rights and remedies available to it under the Lease or under law, including the right to amounts due under the Lease as of the date of termination. Lessor demands that Lessee immediately ship the Engine to AAR's facility at 1100 N. Wood Dale Road, Wood Dale, Illinois 60191 USA.

Sincerely,

James N. Vincent
Vice President